UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                            )
ABSOLUTE RESOLUTIONS INVESTMENTS,           )     Case No. 1:22-cv-335
LLC,                                        )
                                            )
                  Plaintiff,                )
                                            )     **COMPLAINT**
                                            )
          vs.                               )
                                            )
                                            )
CITIBANK, N.A.,                             )
                                            )
                  Defendant.                )
                                            )
                                            )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

     Plaintiff Absolute Resolutions Investments, LLC ("Absolute"), by and through its undersigned attorneys, for its complaint against defendant, Citibank, N.A. ("Citi"), hereby alleges as follows:

## NATURE OF THE ACTION

     1.    This is an action to remedy a fraud: since October 2019, Absolute has paid Citi approximately $23 million for portfolios of delinquent consumer credit card accounts based on Citi's representations about the characteristics of those accounts. Absolute's business is to acquire and manage debt from primary creditors, and it bid on portfolios presented by Citi after careful review of due diligence files, which were supposed to be accurate representations of the types of accounts to be included in the portfolios after purchase. But unbeknownst to Absolute at the time, Citi had no intention of transferring the quality of accounts promised. Instead, Citi took Absolute's money and then offloaded its undesirable debt accounts to Absolute—keeping for itself (or other, more preferred stakeholders) the more desirable accounts with a higher likelihood of recovery.

2.      The details surrounding Citi's fraud are somewhat complex, but the crux of this case is simple: Citi promised to sell Absolute something of value—even showing Absolute a detailed preview of the product being offered—but what Citi ultimately transferred to Absolute was much less valuable than what had been previewed. It was a classic "bait and switch."

3.      Citi, for its part, denies any responsibility; claiming that any discrepancy between what was promised and what was delivered was the result of "randomized" account removals. Putting aside the fact that the contracts between the parties do not permit such subtractions, careful statistical analysis shows that the discrepancies are far too significant to have been "random." Rather, the performance of the transferred accounts leaves little doubt that Citi culled the more desirable accounts from the portfolios before transferring the accounts to Absolute—leaving Absolute holding the very expensive equivalent of a dandelion bouquet after paying for roses.

4.      If Absolute had known the true characteristics of the portfolios Citi would ultimately transfer, Absolute would—at a minimum—have bid far less for the portfolios, or not bid on the portfolios at all. But Absolute had no way to know, at the time it placed its bids, what Citi actually would deliver. Absolute only knew that it had a representation from Citi that the delivered set of accounts would be substantially similar to the set of accounts that Absolute was bidding on. Therefore, Absolute has paid millions of dollars for portfolios laden with lower-value accounts with significantly impaired chances of recovery. Absolute's claim, at its core, is simple: Citi had no right under the applicable contracts to remove batches of accounts for "control" purposes, but if the court were to find that it did, such removals had to be done in a truly random fashion and not in a materially adverse (to Absolute) manner.

5.      Citi's fraud and malfeasance were made possible by internal compliance failures at Citi, which in turn created a window of opportunity for certain employees of Citi to cull the more

favorable accounts—perhaps keeping those accounts for Citi's benefit, or perhaps selling those accounts to other third-party buyers of consumer debt who have personal relationships with those Bank employees. Discovery is necessary to determine how Citi allocated or handled the favorable accounts that Absolute understood it was purchasing.

6.  One thing is already certain: Absolute has suffered millions of dollars in damages[1] as a result of Citi's fraud and lack of proper compliance oversight.

## THE PARTIES

7.  Absolute is a limited liability company organized under the laws of the State of Arizona with its principal place of business in Bloomington, Minnesota.

8.  Upon information and belief, Citibank is a national banking association organized under the laws of the United States with its principal place of business at 399 Park Avenue, New York, New York 10043.

## JURISDICTION AND VENUE

9.  This Court has personal jurisdiction over Defendant because Defendant maintains its principal office and transacts business in this District.

10.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because (i) this is an action between citizen of different States, and (ii) the matter and controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

11.  Venue lies in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

---

[1] Although Citi presented Absolute with a release at a certain point in time, Absolute's position is that the release was procured by fraud and is not valid. Should the Court hold otherwise, Absolute's damages may arguably be limited, but the gravamen of its claims would survive.

# FACTS

## Citi's Debt Sale Process

12.    For approximately twenty years Absolute has been in the business of acquiring and managing debt from primary creditors, including a broad range of financial institutions. Absolute uses sophisticated proprietary analytics to evaluate debt portfolios for purchase and to maximize the collectability of the portfolios it acquires.

13.    Citi's business includes branded and retail credit card products and services. In addition to offering Citibank-branded cards, Citi also has an arm called "Citi Retail Services," through which it partners with retail brands—*i.e.*, Costco, Macy's, and Best Buy—to provide private label and co-branded cards and services.

14.    Citi maintains a list of approved outside buyers to which it markets certain portfolios of delinquent consumer credit card accounts. Third-party buyers are not provided clear and articulated grounds for obtaining approval or why their approval may be revoked, and the process appears to be infected by favoritism and cronyism.

15.    Citi sells off batches of delinquent credit card accounts to its approved third-party buyers or places them at a collection agency for Citi's benefit.

16.    Citi sells certain charged-off accounts in "bulk" and others—such as the accounts at issue here and as detailed below—pursuant to a multi-month "flow" of sales with an initial due diligence phase.

17.    In either scenario, Citi first groups charged-off accounts according to certain common characteristics, such as whether they consist of Citi-branded or retail consumer (*e.g.*, Costco) credit card accounts (or both), and other common features, such as the age of the debt

4

(*e.g.*, accounts labeled "Early Out" are recently charged-off accounts that were recalled from pre-charge off collection agencies, including debt settlement account servicers).

18.     After bundling the charged-off accounts Citi initiates a bidding process. As part of this process, prospective buyers are given a sample portfolio to assist them in pricing their bids. The sample portfolio contains account-level information about debts to be included in the first month's sale portfolio, such as the amount owed by the debtor (*i.e.*, the "charge-off balance"), the charge-off date, last payment date, whether there has been a first payment default, the state of residence of the account holder, whether the account is eligible for assistance from a debt settlement company, and other important information about the account.

19.     The sample portfolio provided by Citi is "masked," meaning that most consumer-specific information is redacted from the file.

20.     For a buyer to perform due diligence on a portfolio, the buyer must utilize the services of a third-party data transferor identified and approved by Citi. The third-party data transferor is provided the "unmasked" portfolio information from Citi and assists the prospective buyer in scoring the portfolio to determine how much to bid.

21.     Based on the sample portfolio information, a prospective buyer is able to see key characteristics of the accounts that enable the buyer to conduct its own analysis of the likelihood of collecting on those accounts and the likely aggregate value of those accounts to the prospective buyer in the event the buyer places a successful bid.

22.     Along with the sample portfolio, prospective buyers (such as Absolute, as relevant here) typically are provided a Seller Survey by Citi. The Seller Survey provides additional portfolio-specific information, including the types of accounts to be contained in the "forward flow" and other characteristics of the portfolio.

23.     This due diligence step is crucial to prospective buyers such as Absolute because it is the stage at which the buyers preview the assets they are preparing to bid on and to determine the price they are willing to bid.

24.     In this process, Citi covenanted to Absolute that the accounts sold will be "substantially similar" to the accounts contained in the due diligence file "in all material scoring characteristics."[2] In other words, the key account characteristics in the purchased account bundles should substantially match, in all material respects, the key account characteristics in the sample portfolio that is presented to bidders such as Absolute to solicit their bids.

25.     After the diligence period, Citi opens bidding to prospective buyers. The bidding is supposed to be "blind"—*i.e.*, prospective buyers are not supposed to be aware of each other's identities or other key bidding information (such as bid amounts)—and the portfolio is supposed to be awarded to the highest qualified bidder.

26.     Often (and as was the case here), the sale offering consists of a "forward flow" of accounts to be released and sold over a period of consecutive months, as delinquent accounts become newly charged off. This relieves Citi of having to initiate a new auction each month. Buyers such as Absolute bid on a multi-month forward flow of accounts, in which each monthly batch received thereunder is supposed to consist of accounts that (i) have reached at least 180 days of delinquent status during the preceding month; and (ii) bear substantially the same material characteristics as those reflected in the sample portfolio provided during the due diligence period.

27.     Citi reserves the limited right to remove from the forward flow any accounts that are legally ineligible for sale, such as where the account holder has died or declared bankruptcy.

---

[2] Citi made that covenant in Master Agreements between Absolute and Citi, which are described herein.

**Absolute Re-Qualifies as a Bank Customer and Steven Dasch Becomes Head of Recoveries**

28.     Absolute purchased its first portfolio directly from Citi in about 2006 and was a consistent buyer of credit card portfolios from Citi from 2011 through 2015 without experiencing during that timeframe the fraud and adverse account selection it later came to suffer.

29.     In 2016, Absolute's status as a Citi-approved buyer was revoked by Citi's head of Recoveries at the time, Michael Taulbee, for reasons that were never fully explained.

30.     Taulbee's employment with Citi was terminated in late 2018 or early 2019. Shortly after Taulbee's termination Absolute was invited to apply for re-approval.

31.     Absolute went through the approval process and was re-qualified in July 2019.

32.     In or about October of 2019, the role of Head of Operations—held by Steven Dasch—was expanded to include control over Citi's debt sales process. The debt sales process had previously fallen within the purview of the role Taulbee had held (with another individual holding that role in the interim).

33.     Upon assuming his new role, Dasch was given supervisory authority over the decision whether to place accounts with outside bidders versus collection agencies and law firms (and, in the latter instance, the specific agencies and law firm recipients); the procedures governing outside bidding (including whether to sell portfolios in quarterly increments or pursuant to a multi-month "forward flow"); and the processes by which accounts were removed from portfolios prior to sale.

34.     Taulbee and Dasch were and remain close acquaintances.

35.     While Dasch had previously been unknown to Absolute, he had and continues to have close relationships with other qualified buyers. Among other examples, Taulbee's wife works at Cavalry Portfolio Services ("Cavalry") and Taulbee works (or worked) at United Holdings

Group ("UHG"). Upon information and belief, Cavalry and UHG are two of the most frequent Citi-approved buyers of Citi's consumer debt portfolios.

36.     Citi's internal compliance processes and controls are wholly insufficient to prevent employees in the Operations group—including Dasch—from culling more favorable accounts from forward-flow batches before those batches are transferred to third-party buyers, or from re-routing those more favorable accounts to buyers, collection agencies (including agencies servicing debt settlement accounts), or law firms with whom they have personal relationships.

**Citi And Absolute Enter Into Agreements To Sell And Purchase Debt Accounts**

37.     After Absolute's re-approval in July of 2019, Citi and Absolute entered into a Master Purchase and Sale Agreement dated July 25, 2019 (the "2019 Master Agreement"). Subsequently, the parties executed a similar Master Purchase and Sale Agreement dated March 9, 2020 (the "2020 Master Agreement" and together with the 2019 Master Agreement, the "Master Agreements").

38.     The two Master Agreements contain nearly identical material terms and conditions, including those terms and conditions under which Citi would sell forward-flow accounts to Absolute. The Master Agreements each contemplate that, in conjunction with the execution of certain Addenda outlining specific additional terms for each sale, Citi would "sell, assign and transfer to [Absolute]," and Absolute would agree "to purchase from Citi on the Closing Date all right, title and interest of Bank in and to the Accounts as specified in an Addendum."

39.     Section 3.3.1 of the Master Agreements sets forth certain specific representations made by Citi in connection with the sale of portfolios under those agreements. Among those representations, Citi promises in Section 3.3.1(i) that "the information provided by Bank on the

due diligence file is substantially similar to the final electronic file provided to Buyer in connection with the closing . . . ."

40.    Citi also covenanted, in Section 3.5, that "[e]xcept as disclosed in the final electronic file, Citi will not employ any selection criteria, materially adverse to the interest of Buyer, in selecting the Accounts sold to the Buyer hereunder."

41.    The Master Agreements set forth a "Pre-Closing Adjustment" process by which the ultimate purchase price for accounts transferred thereunder would be adjusted to reflect two possible situations: (i) a change in the balance of a particular account as compared to what was reflected in the due diligence file; or (ii) retention by Citi of any accounts which either failed to meet the representations made in Section 3.3, or as to which "[Citi] determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to" such account. Per the Master Agreements, "The Purchase Price will be adjusted by the amount associated with any balance or Account described above. [Citi] will notify the Buyer of the adjusted Purchase Price prior to the Closing Date."

42.    No other holdbacks of accounts are permitted under the Master Agreements.

**Problems Arise With Three Forward Flow Debt Portfolios**

43.    In October of 2019 Absolute participated in a bidding process for a four-month Citi Brands and Costco "Early Out" forward flow pursuant to the 2019 Master Agreement. In connection with that process Absolute received from Citi a due diligence file containing a preview of the types of accounts to be offered in the forward flow. Citi also provided Absolute and other bidders with a "Seller Survey" as part of the bid package.

44.     The "Seller Survey" purported to contain additional information concerning the accounts subject to sale, such as the total number of accounts being offered for purchase (19,597), and certain details concerning the pre-charge-off collection activity on the accounts.

45.     The "Seller Survey" contained the following question and answer under the heading, "General Information":

> Will a population of accounts be retained by Citi?
>
> *Yes, up to 10% of the sale eligible accounts will likely be retained by Citi from each month's delivery, but reserve the right to withhold up to 20%. These accounts are randomly selected from the sale eligible pool.*

46.     Absolute has come to understand that the supposedly "random" removal of accounts by Citi was designed to act as a "control" process whereby Citi could compare the performance of the accounts it retained to the value it realized from a sale. By randomly selecting a small group of accounts to hold back from the sale file and placing those accounts with a collection agency to collect on Citi's behalf, Citi could evaluate whether it made sense to continue to sell certain species of accounts to third-party buyers such as Absolute, versus placing them with outside collection agencies, law firms, or debt settlement servicing agencies.

47.     However, this "control" process also provided an opportunity for Citi to improperly "cherry pick" higher-quality accounts, despite its statement that the selection and removal process would be randomized.

48.     The "Seller Survey" also contained the following disclaimer at the bottom of each page: "The following Seller's Survey provides context to the sale identified with the survey. The contents are based upon current information available and all answers are to Seller's actual knowledge. Seller advises that variances may occur with respect to actual product delivered."

49.     There is no provision in the Master Agreement reflecting Citi's representation in the Seller Survey that a portion of the accounts would be "randomly selected" and removed.

50.     Citi thereafter advised Absolute that Absolute was the successful bidder for the four-month forward flow beginning in October 2019. Citi issued an Addendum covering that forward flow, which was entitled "October 2019 Brands and Costco Early Out 120 Day Flow Accounts."

51.     The Addendum contained an asset schedule and the specific purchase price and confirmed that the forward flow would consist of four consecutive months of account sales beginning on or before October 30, 2019.

52.     The Addendum contained the following language under the heading "Special Provisions": "Each data file delivered by [Citi] to the Buyer during the term of this Agreement shall be substantially similar to the data file on which Buyer based its bid in all material scoring characteristics."

53.     It is well known in Absolute's industry—and was known to both Absolute and Citi during the relevant time period—that "material scoring characteristics" include, among others, the amount of outstanding debt on each account; the state in which each account holder resides; and whether the account is currently enrolled with a debt settlement company.

54.     Thereafter, Citi sold to Absolute the four-month forward flow ("FF1") consisting of four consecutive monthly batches with the following transfer dates:

      (1)     October 30, 2019 (Purchase Price $2,805,102)

      (2)     November 26, 2019 (Purchase Price $3,466,460)

      (3)     December 30, 2019 (Purchase Price $2,728,259)

      (4)     January 24, 2020 (Purchase Price $3,008,372)

55.     Each monthly portfolio of accounts received by Absolute turned out to be different—and worse—than what Absolute had bid upon, to a statistically significant degree.

56.     For example, Citi provided information to Absolute for a total of 4,468 accounts (with balances of nearly $25 million in total), in order to evaluate the potential purchase of the accounts to be included in FF1. Of these accounts, 2,367 (53%) were identified by Absolute as higher-value accounts, a category which includes accounts subject to creditor-advantageous collection states and accounts qualifying for debt settlement company assistance.

57.     However, the final file provided to Absolute was missing 649 of the 4468 accounts previewed during due diligence (14.5%). Of the 649 removed accounts, 64% (414) were high-value accounts, while only 51% (1,953 of 3,819) of the remaining accounts were high-value accounts. As a result, the portfolio ultimately sold to Absolute in October 2019 contained a materially *lower* percentage of higher-value accounts and a materially *higher* percentage of lower-value accounts than what had been previewed in due diligence.

58.     Statistical analysis reveals that the higher value accounts were not simply removed at "random." Had that been the case, approximately 53% of the removed accounts would have been high value accounts, as opposed to the 64% actually removed. In particular, standard statistical analysis indicates that had the accounts been removed at random, only rarely would more than 366 high value accounts (or less than 321) have been removed. The 414 actually removed falls well outside this range.

59.     Though disappointed in the profile of the October 2019 portfolio, Absolute hoped and expected that the remaining months of the FF1 flow would profile as promised. Instead, however, the November 2019, December 2019, and January 2020 portfolios also were worse than the due diligence file to a statistically significant degree. Unlike with respect to the first month of the flow (October 2019), Absolute was not given information concerning the number and types of accounts removed prior to sale. Citi followed the same procedures for the creation of each portfolio

within the flow as it did for the first month's portfolio, including the withholding of a supposedly "randomized" control group of accounts.

60.   The results to date confirm that the FF1 portfolios are materially underperforming relative to their expected return. As depicted in the following chart, Absolute now expects to recover millions less than it spent to acquire the FF1 portfolios, as opposed to the multiple it typically realizes:



61.   Subsequently, Citi sold to Absolute two additional forward flows under the 2020 Master Agreement ("FF2" and "FF3").

62.   FF2, the earlier of these two 2020 forward flows, consisted of Citi Brands and Costco "Early Out" accounts with the following transfer dates and purchase prices, each governed by the terms of the 2020 Master Agreement as well as an applicable Addendum:

(1)   March 30, 2020 (Purchase Price $2,890,541)

(2)   May 29, 2020 (Purchase Price $3,402,229)

63.     The due diligence package for FF2 contained a "Seller Survey" which advised that "up to 15% of sale eligible accounts will likely be retained by Citi from each month's delivery, but [Citi] reserve[s] the right to withhold up to 20%. These accounts are randomly selected from the sale eligible pool."

64.     No such "random" removal of accounts was provided for under the 2020 Master Agreement.

65.     For the FF2 first month's file (March 2020), Citi removed 909 of the 5574 accounts previewed during due diligence (16.3%). Of those removed accounts, 68% of them were higher-value accounts, including 16% of the accounts eligible for *both* debt settlement company assistance and legal enforcement ("DSC Overlap") – historically the highest-liquidating accounts. As a result, the portfolio ultimately sold to Absolute in March 2020 contained a materially *lower* percentage of higher-value accounts and a materially *higher* percentage of lower-value accounts than what had been previewed in due diligence.

66.     In April 2020, Citi abruptly announced to Absolute that all flows were being suspended purportedly due to the COVID-19 pandemic, even though other Citi buyers reported to Absolute at the time that their closings were proceeding as planned, and even though Citi was not contractually or otherwise permitted to suspend their flows. Citi refused to sell Absolute a file for that month, despite Absolute's complaints.

67.     The problems continued when sales resumed the following month. Among other issues, the May 2020 file included accounts that had been charged off in January, February, March, and April, despite being represented as a flow of "early out" accounts (recently charged-off accounts that were recalled from pre-charge-off collection agencies).

68.     More concerningly, Citi insisted, for the very first time, that Absolute execute a release in order to proceed with the May 2020 closing. The release Citi presented to Absolute, which Absolute reluctantly signed under threat, purported to absolve Citi from liability for adversely selecting and removing accounts—despite Citi's steadfast denials that any such adverse selection had occurred. Citi implied that, absent such a release, Absolute would be dropped as an approved debt buyer and prohibited from purchasing debt in the future. Left with little choice, Absolute executed the requested release.

69.     The problems with the monthly portfolios nevertheless persisted. By letter dated June 16, 2020, Absolute reiterated its concerns with the monthly sales flows, including what appeared to be the removal of higher-value accounts.

70.     In the summer of 2020 Absolute bid on another forward flow of accounts (FF3) consisting of Citi Brands and Costco "Fresh" accounts. The label "fresh" was significant to Absolute, as "fresh" is an industry term for accounts that have just become charged off and have not yet been "worked" by outside agencies—historically among the highest-performing accounts. Absolute hoped that Citi labeling these accounts "fresh," after having been alerted to Absolute's concerns by its June 16 letter, indicated that Citi had addressed the problems that occurred with respect to FF1 and FF2 and that the accounts within FF3 would liquidate at the expected typical high rate.

71.     Absolute purchased the FF3 accounts on the following transfer dates and purchase prices, each governed by the terms of the 2020 Master Agreement as well as an applicable Addendum:

1.     September 25, 2020 (Purchase Price $1,569,387)

2.     October 21, 2020 (Purchase Price $1,872,743)

3.      November 23, 2020 (Purchase Price $1,625,974)

72.      The Seller Survey accompanying FF3 stated that "an estimated 10% of the sale eligible accounts may be retained by Citi from each month's delivery. Citi reserves the right to retain a higher percentage with notification prior to delivery. These accounts are randomly selected from the sale eligible pool."

73.      No such "random" removal of accounts was provided for under the 2020 Master Agreement.

74.      To Absolute's dismay, however, the removals were once again statistically significant and to Absolute's detriment. For the FF3 first month's file (September 2020), Citi had removed 387 of the 2,309 accounts previewed during due diligence (16.7%) with no prior notification. Of those removed accounts, once again nearly three quarters of them were higher-value accounts, including 17% of the DSC Overlap accounts that had been previewed. As a result, the portfolio ultimately sold to Absolute in September 2020 contained a materially *lower* percentage of higher-value accounts and a materially *higher* percentage of lower-value accounts than what had been previewed in due diligence.

75.      Moreover, despite being labeled a "Fresh" account flow—an industry label for accounts that just became charged off and have not been "worked" by outside collections departments or agencies—the flow could hardly be considered "Fresh" given the composition of each month's account pool and the unusually poor liquidation of those pools to date .

76.      In sum, for every month of flows FF1, FF2 and FF3, the accounts ultimately sold to Absolute were worse, to a statistically significant degree, than similarly-profiling portfolios sold to Absolute under Dasch's predecessor.

77.     In particular, the average charge-off balance of accounts sold to Absolute, the percentage of DSC Overlap accounts, and the percentage of high-value accounts overall were all lower, to a statistically significant degree, than they had been before Dasch's role expanded to include debt sales. Meanwhile, the percentage of accounts qualifying for agency collection work (which are significantly lower-value accounts) were higher after Dasch's promotion, also to a statistically significant degree.

78.     The considerable degradation in the quality of accounts sold to Absolute after Dasch took control of Risk is strong evidence that accounts had been cherry-picked from the final sales files under his watch.

79.     In the fall of 2020, Absolute again reached out to Citi in an effort to address the continued issues with the purchased portfolios, which had continued with the falsely-labeled "fresh" FF3 flow.

80.     In particular, Absolute requested information from Citi concerning the removal of accounts from the monthly sale files and requested that the statement in the Seller Surveys that the removed accounts "are randomly selected from the sale eligible pool" be included as a formal representation under the Master Services Agreement or applicable Addenda. Absolute also demanded that Citi explain its use of the term "fresh" given the apparent mislabeling that had occurred with respect to FF3.

81.     Citi refused to provide the information requested by Absolute and further refused to incorporate its Seller Survey statements into its agreements with Absolute.

**Citi Terminates Absolute For Its Whistleblowing**

82.     In light of these refusals, in December 2020 Absolute advised Citi that it would pause its funding of additional monthly flows until it could satisfy itself as to the *bona fides* of Citi's sales and selection process.

83.     On January 15, 2021, in the midst of ongoing discussions between the parties and their respective counsel about these matters, Citi abruptly issued a termination letter to Absolute, accusing Absolute of being in default under the 2020 Master Agreement due to Absolute's suspension of funding, purporting to terminate the 2020 Master Agreement, and revoking Absolute's status as an approved debt buyer.

**The Selection and Removal of Accounts Sold to Absolute Was Not Random**

84.     A statistical analysis comparing the accounts sold to Absolute under FF1, FF2 and FF3 as compared to the due diligence files for each flow, demonstrates that the variances were statistically significant and could not have been random.

85.     As explained above, for FF1, FF2, and FF3, a materially higher percentage of removed accounts were classifiable as DSC Overlap, as compared to the accounts eventually delivered to Absolute.  For FF2 and FF3, this difference was statistically significant, meaning that it would be highly unlikely from a statistical standpoint that these higher-value accounts were removed through a random selection process. Instead, the selection and removal of DSC Overlap accounts was systematically detrimental to Absolute and appears to have been intentional rather than random.

86.     In addition, for FF1, FF2, and FF3, the removed accounts had higher overall balances and contained a higher percentage of accounts with balances greater than $10,000 (and were thus more attractive accounts), as compared to the accounts ultimately delivered to Absolute.

Once again, for both FF2 and FF3, these differences were statistically significant, meaning it is highly improbable that this disproportionate removal of higher-balance accounts occurred at random. Instead, the selection and removal of accounts once again can only be statistically explained by intentional adverse selection.

87.     The chance of each of these statistically improbable results coincidentally inuring to Citi's benefit and Absolute's detriment is simply not plausible.

**Citi's Well-Documented Compliance Failures**

88.     Citi's troubling history of with internal control issues and lax compliance environment has been well-documented.

89.     Most recently, in October 2020 the Office of the Comptroller of Currency ("OCC") fined Citi $400 million and issued a consented-to Cease & Desist Order ("C&D Order") upon finding that "[f]or several years, [Citi] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with [Citi's] size, complexity, and risk profile."[3]

90.     In particular, OCC made findings as to the "failure of [Citi's] enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks" and the "failure of compensation and performance management programs to incentivize effective risk management." The OCC's findings also "identified unsafe or unsound practices with respect to [Citi's] internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations."[4]

---

[3] *See* https://www.occ.gov/static/enforcement-actions/ea2020-056.pdf.

[4] *See id.*

91.     As a result of the C&D Order, Citi was directed to implement "broad and comprehensive corrective actions" to improve its risk management, data governance, and internal controls.[5]

**Absolute's Significant Damages**

92.     Because of its proprietary recovery methodology and procedures, Absolute almost uniformly realizes a multiple of its purchase price for the consumer debt accounts it acquires. Here, however, Absolute instead expects to lose money on the culled batches of accounts it purchased from Citi.

93.     Specifically, based on current estimates, Absolute expects to lose somewhere between 10-25% of its $23 million investment—not even recovering its cost basis—rather than achieving a high multiple rate-of-return. These losses are solely attributable to the degraded quality of the accounts Absolute purchased from Citi.

94.     In addition, as Citi knows, Absolute's financial arrangement with its lenders is dependent, in part, upon its realization rate. As a result of purchasing accounts from Citi that were worse than what was promised, Absolute's loan and interest expenses will be significantly higher than they would otherwise have been because of the lower cash velocities and higher collection costs. Absolute has also lost out on other investment opportunities and suffered reputational harm as a result of its improper removal from Citi's qualified debt seller list.

---

[5] *See* https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-132.html.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Fraud

95.     Absolute repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

96.     Citi, as the owner of the consumer debt accounts, made representations to Absolute concerning the composition and characteristics of the accounts that would be transferred to Absolute.

97.     These oral and written misrepresentations and omissions, as described in the preceding allegations, included representations regarding the similarities between the due diligence file and the accounts to be transferred; the types and quality of the accounts to be transferred; and the method by which accounts were selected to be transferred to Absolute or (conversely) held back by Citi.

98.     Citi's representations were materially false and misleading when they were made to Absolute, and they were made intentionally or with reckless disregard for the truth.

99.     Citi made these misrepresentations and omissions to Absolute with the knowledge that Absolute would rely on them.

100.    Citi had an affirmative duty to provide complete and accurate disclosures of the material facts about the debt portfolios to be transferred to Absolute, and about Citi's process for selecting the accounts that would be transferred or withheld. Those material facts were peculiarly within Citi's knowledge and Absolute would have no independent way to verify or ascertain the truth about those facts. Citi intentionally or recklessly failed to provide full, complete, and accurate disclosures of these material facts.

101.    Absolute reasonably and justifiably relied, to its detriment, on Citi's above-described misrepresentations and omissions, including Citi's affirmative duty to provide full, complete, and accurate disclosures to Absolute.

102.    Citi's misrepresentations and omissions induced Absolute to purchase the above-described debt accounts.

103.    As a direct and proximate result of Citi's conduct, Absolute has suffered damages, and Citi is liable to Absolute in an amount to be determined at trial plus interest.

104.    Absolute also is entitled to punitive damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Negligent Misrepresentation**

105.    Absolute repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

106.    Citi had a duty to Absolute to exercise reasonable care in providing information about the debt accounts it would transfer to Absolute, and how those accounts would be selected for transfer or to be withheld. Absolute's reliance on the information provided by Citi was reasonable and foreseeable. Citi knew that Absolute desired accurate information to decide whether or not to purchase bundles of debt accounts from Citi; that Absolute intended to rely or act on the information provided by Citi; and that Absolute would suffer injury if the information was false or erroneous.

107.    Citi had unique and one-sided access to information regarding the characteristics of the debt accounts in its possession and its methods for selecting accounts that would be transferred to Absolute. Citi occupied a special position of confidence and trust with respect to Absolute and Absolute did, in fact, repose confidence and trust in Citi with respect to Absolute's purchase of debt accounts.

108.    Absolute's reliance on Citi's negligent misrepresentations was justified because Citi had sole access to the information upon which Absolute needed to rely in bidding on and purchasing debt accounts. Citi was aware of the use to which the information would be put and supplied it for that purpose.

109.    As a direct, proximate, and foreseeable result of Citi's negligent misrepresentations, Absolute was injured in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Breach of Contract

110.    Absolute repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

111.    Absolute and Citi are parties to binding and written agreements, including the Master Agreements and the Addenda to the Master Agreements.

112.    Absolute has performed all of its obligations under the Master Agreements and related Addenda, by purchasing debt portfolios from Citi at the times and at the prices agreed upon by the parties.

113.    Citi, on the other hand, has materially breached its contractual obligations to Absolute.

114.    Among other things, Citi promised to sell to Absolute portfolios of consumer debt having specific account characteristics, subject only to specifically-identified holdbacks such as the existence of a pending or threatened suit, bankruptcy proceeding or other legal proceeding involving the debtor.

115.    Neither the Master Agreements nor the Addenda permit Citi to randomly or selectively remove accounts for quality-control, compliance-related or other purposes, nor do the

parties' contracts allow Citi to materially degrade the portfolios by removing higher-value accounts prior to transferring them to Absolute.

116.    For example, the parties' "Addendum No. 3" to the March 9, 2020 Master Agreement pledged that Citi would be transferring to Absolute a group of accounts labeled, "Costco Fresh – 180 Day Flow Accounts."

117.    The label "Costco Fresh" was not defined in the Addendum; instead, its meaning was inferred from the industry understanding of "fresh" accounts, and from the accounts that had been previewed during due diligence.

118.    Yet prior to transferring the accounts in question, Citi adversely (to Absolute) removed higher-value accounts, materially degrading the overall quality of the three-month flow. What Absolute ultimately acquired from Citi was far worse in quality than the "fresh" accounts that had been previewed in due diligence.

119.    None of this was permitted by the parties' contracts.

120.    By removing batches of high-value accounts prior to transfer, Citi materially breached the Master Agreements and Addenda.

121.    The Bank has been damaged by these aforementioned breaches in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Breach of the Covenant of Good Faith and Fair Dealing**

122.    Absolute repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

123.    Absolute and Citi are parties to binding and written agreements, including the Master Agreements and the Addenda to the Master Agreements.

124.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, which means that neither party will commit any act that has the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

125.     Citi has acted deliberately and in a manner that has deprived Absolute of the right to receive the benefits under the Master Agreements and the related Addenda, which benefits are separate from those for which Absolute specifically contracted under the Master Agreements. Specifically, Absolute was to purchase from Citi portfolios of consumer debt accounts that would substantially match, in all material respects, the characteristics of the accounts contained in the due diligence portfolios provided to Absolute by Citi.

126.     Citi instead withheld accounts that had higher values and more favorable characteristics; transferring to Absolute portfolios of less favorable accounts with lower likelihoods of recovery.

127.     Citi did not retain the right in any agreement with Absolute to withhold accounts randomly or intentionally adversely to Absolute, and that term was never discussed or negotiated between the parties.

128.     Inasmuch as the Court determines that Citi could permissibly holdback accounts, the selective manner in which Citi held back those accounts to Absolute's detriment violated the implied covenant of good faith and fair dealing and robbed Absolute of the benefit of its bargain.

129.     As a direct result of Citi's conduct, Absolute was injured in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Absolute Resolutions Investments, LLC requests that this Court grant the following relief:

A) Judgement against Citi on Count I or Count II, awarding Plaintiffs its damages arising from Citi's fraudulent or negligent statements and/or omissions in an amount to be proven at trial, together with punitive damages and interest as determined to be appropriate;

B) Judgement against Defendants on Count III or Count IV, awarding Plaintiff its compensatory damages arising from Citi breach of the Master Agreements and the Addenda to the Master Agreements or the implied covenant of good faith and fair dealing inherent therein, an amount to be proven at trial, together with interest;

C) Judgment against Defendants as may otherwise be appropriate based upon the facts determined in this matter, including ordering disgorgement of their ill-gotten gains in an amount to be determined at trial, and including any compensation or payment received by Defendants from Plaintiffs, pre- and post-judgment interest, fees, and costs plus interest accrued and continuing to accrue thereon; and/or

D) Such other and further relief as the Court may deem just and proper.

Dated:      January 13, 2022                          HARRIS ST. LAURENT & WECHSLER LLP
            New York, New York

                                                      By: /s Yonaton Aronoff_____
                                                         Jonathan Harris
                                                         Yonaton Aronoff
                                                         Alisha L. McCarthy
                                                         40 Wall Street, 53rd Floor
                                                         New York, NY 10005
                                                         Tel: 212.397.3370
                                                         jon@hs-law.com
                                                         yaronoff@hs-law.com
                                                         amccarthy@hs-law.com

                                                         *Attorneys for Plaintiff*